UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>PARALLAX HEALTH SCIENCES, INC., PAUL R. ARENA, and NATHANIEL T. BRADLEY,<br><br>    Defendants. | Civil Action No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities & Exchange Commission (the "Commission"), in its Complaint against Defendants Parallax Health Sciences, Inc. ("Parallax"), Paul R. Arena ("Arena") and Nathaniel T. Bradley ("Bradley"), alleges as follows:

## SUMMARY

1. Between March 11, 2020 and April 9, 2020, Parallax, a healthcare company founded in 2010 whose stock is publicly traded, issued a series of seven press releases misleading investors about the company's ability to capitalize on the COVID-19 pandemic. The releases made several false representations, including that a COVID-19 screening test that Parallax purported to be developing would be "available soon," and that the company had personal protective equipment ("PPE") and ventilators and other medical equipment for "immediate sale." In fact, when the company issued the releases, Parallax was insolvent and did not have the capital to develop a test. Parallax's own internal projections also estimated that, even if the company had the funds, it would take it more than a year to develop a test. Moreover, Parallax did not possess the PPE and medical equipment that it offered for sale, and had neither

the money to purchase the equipment nor the Food and Drug Administration ("FDA") registrations needed to import and distribute the equipment.

2. Arena, Parallax's Chief Executive Officer, directed and oversaw the company's operations and finances. Arena knew that Parallax did not have enough money to develop a COVID-19 screening test or to acquire PPE or medical equipment. He also knew that Parallax lacked the FDA registrations required to import and sell the PPE and medical equipment. However, he drafted the seven misleading press releases to boost Parallax's declining stock price, deliberately misrepresenting that the company would make a COVID-19 test available soon and that it possessed PPE and medical equipment. This plan was successful. During the approximately four-week period beginning March 11, 2020, the daily closing price of Parallax's common stock in the U.S. markets was, on average, 20% higher than the period between January 1, 2020 and March 10, 2020, the day before Parallax issued the first misleading release.

3. Bradley, Parallax's Chief Technology Officer, was primarily responsible for developing the company's remote monitoring healthcare technology, but, during the COVID-19 pandemic, he assisted in the company's attempt to source and sell PPE and medical equipment. In connection with these efforts, Bradley helped Arena draft two press releases and posted content on Parallax's website, claiming that the company had PPE and medical equipment for immediate sale. Although Bradley was unaware of Arena's plan to artificially boost Parallax's stock price, he publicized Parallax's claims that it had PPE and medical equipment available for sale without verifying that Parallax had the requisite capital and the necessary FDA registrations in place to acquire and distribute the equipment.

**VIOLATIONS**

4. By engaging in the conduct alleged in this Complaint, Parallax and Arena violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ('Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Bradley violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**JURISDICTION AND VENUE**

5. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

6. The Commission respectfully requests a Final Judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to pay civil money penalties pursuant to Section 21(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (c) barring Defendants Arena and Bradley from participating in any offering of a penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; (d) imposing an officer and director bar against Arena pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and, (e) ordering any other and further relief the Court may deem just and proper.

7. This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

8. In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in, or instrumentalities of, interstate commerce or the mails or the facilities of a national securities exchange.

9. Venue lies in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. At all times relevant to this Complaint, Parallax maintained an office in New York, New York and offered its products and securities for sale in this District.

## DEFENDANTS

10. **Parallax Health Sciences, Inc.** is a Nevada corporation with offices in New York, New York and Santa Monica, California. Parallax's common stock is registered with the Commission pursuant to Section 12(g) of the Securities Act and was quoted on OTC Link operated by the OTC Markets Group Inc. until the Commission issued an order on April 10, 2020 that temporarily suspended trading in the company's securities from April 13, 2020 to April 24, 2020. Parallax's common stock is presently bought and sold over the counter.

11. **Paul R. Arena**, age 63, is a resident of New York, New York. Arena has been the Chief Executive Officer ("CEO") and a director of Parallax since July 2017. From July 2017 to March 2020, he also served as Parallax's President.

12. **Nathaniel T. Bradley**, age 45, is a resident of Colts Neck, New Jersey. Bradley has been the Chief Technology Officer ("CTO") of Parallax since January 2016 and a director of the company since June 2018.

**FACTUAL BACKGROUND**

13. At all times relevant to this Complaint, Defendant Parallax was a publicly traded company with the ticker symbol PRLX and was required to file periodic reports with the Commission.

14. On May 18, 2020, following the suspension of trading in the company's securities, Parallax filed an annual report with the Commission on Form 10-K for the year ended December 31, 2019 ("2019 10-K"). Parallax has not filed more current reports with the Commission.

15. Parallax described itself in the 2019 10-K as "a healthcare company focused on developing products and services that can provide remote communication, diagnosis, treatment, and monitoring of patients on a proprietary platform."

16. Parallax filed audited financial statements for the year ended December 31, 2019, with the 2019 10-K. The financial statements show that Parallax suffered a $6.4 million operating loss in 2019, and that the company's liabilities exceeded its assets.

17. Parallax reported in the 2019 10-K that its assets included, among other things, (1) the Target System testing platform, consisting of the Target Antigen Detection ("TAD") Cartridge and the FDA-cleared VT-1000 Desktop Analyzer ("VT-1000"), and (2) twenty-five FDA-cleared blood tests designed to be utilized with the Target System testing platform to detect certain infectious diseases, cardiac and other medical conditions, pregnancy, and drug use. Operationally, the TAD Cartridge was said to test a blood sample and produce a qualitative result (positive or negative), and additional quantitative information could be derived by inserting the TAD Cartridge into the VT-1000.

18. Parallax did not develop the Target System testing platform. The diagnostic platform was developed by another company in the late 1980s and early 1990s. In 2010, Parallax entered into a license agreement giving Parallax the right to commercialize the Target System. Parallax reported in the 2019 10-K that, as of December 31, 2019, it "has not yet commenced commercial operations of the Target System, and thus has yet to develop methods of distribution for its diagnostics products beyond the business plan stage." Parallax further reported in the 2019 10-K that "[t]he Target System is not commercially available at this time, as the product is currently in redesign and development, with a primary focus on developing the SPARKS Mobile™, the patented handheld mobile version of the VT-1000 desktop analyzer." Parallax's 2019 10-K further noted that "[t]he SPARKS Mobile™ is currently in the design stage of the development process."

19. At all times relevant to this Complaint, Parallax did not possess a test that had been approved or cleared by the FDA to screen for COVID-19. Parallax reported in the 2019 10-K that it was "in the process of developing a test cartridge for the diagnosis of the COVID-19 virus," and that the company "anticipates the need for a minimum of an additional three million dollars ($3,000,000) of investment capital for it to achieve its goals of developing a commercially viable rapid …COVID-19 diagnostic test and the SPARKS Mobile™ Analyzer version of the VT-1000 Desktop Analyzer."

20. From at least January 1, 2020 through April 10, 2020, Parallax raised approximately $912,000 from a private offering and sale of securities and a promissory note. Parallax used the proceeds from the sale of the shares and the promissory note to pay operating expenses and short-term debt obligations. As of March 31, 2020, Parallax had approximately $172,000 in cash.

**Parallax and Arena Made Misleading Statements
About the Impending Availability of a COVID-19 Test**

21.     In late February 2020, Defendants Parallax and Arena decided that the company should attempt to develop a TAD Cartridge to screen for COVID-19 that could be utilized with either the VT-1000 or the (yet to be developed) SPARKS Mobile. Shortly thereafter, Parallax issued four press releases, all drafted by Arena, that misled investors about when the company's purported COVID-19 screening test would become available.

22.     On March 11, 2020, Parallax issued a press release addressing, for the first time, the COVID-19 pandemic. The release stated that Parallax was "in discussions with" the Centers for Disease Control ("CDC"), the World Health Organization ("WHO"), and private laboratories and universities "to assist in facilitating its participation in providing diagnostic solutions for the creation of mobile screening tests." The release announced Parallax's "Intent to Develop a Rapid Screening Test for COVID-19 on its FDA 510(K) Approved Diagnostic Platform."

23.     On March 12, 2020, Parallax issued another press release addressing the COVID-19 pandemic. Arena was quoted in the release, saying: "Yesterday we announced our strategic initiative for the creation of a rapid screening test on our VT-1000 diagnostics device for the Covid-19 that when **available soon** will produce results within 15 minutes." (Emphasis added.)

24.     On March 16, 2020 and March 17, 2020, Parallax disseminated two more press releases concerning the COVID-19 pandemic. The March 16, 2020 release stated that Parallax had a "strategic initiative for the creation of a rapid screening test on its VT-1000 diagnostics device for COVID-19 that when **soon available** will produce results within 15 minutes." (Emphasis added.) The March 17, 2020 release stated that the company's "ongoing strategic initiative for the creation of a rapid screening test on its VT-1000 diagnostics device for COVID-

7

19, coronavirus testing that when **soon available** will produce results in 15 minutes." (Emphasis added.)

25. As Parallax and Arena knew or recklessly ignored, Parallax was not in discussions with the CDC, the WHO, or private labs or universities concerning the development of the company's purported COVID-19 screening test, and the test would not be available within the timeframes they represented to investors. Indeed, an internal Parallax document emailed by Arena to others at Parallax on March 14, 2020 estimated it would take approximately 12 months to commercialize the VT-1000, about 12 to 14 months to develop the SPARKS Mobile, and approximately 12 months to commercialize the TAD Cartridge. As Parallax had only begun planning to create its COVID-19 test at the end of February 2020, the statements by Defendants Parallax and Arena that Parallax's test would be "available soon" were false and misleading.

26. Moreover, as Parallax and Arena knew or recklessly ignored, Parallax lacked the funds to develop a COVID-19 test. Indeed, the company was insolvent. None of the March 2020 public statements alerted investors that Parallax was insolvent and did not otherwise have the financial wherewithal to develop and launch a rapid screening test for COVID-19. Parallax did not have the estimated $3 million in funds needed to develop prototypes, or to conduct required clinical trials, and further, had no reasonable prospect of raising that much capital.

### Parallax, Arena, and Bradley Made Misleading Statements
### About the Availability of COVID-19 Related Products and Sales

27. Defendants Parallax and Arena also misled investors by falsely stating that the company had available for immediate sale COVID-19 test kits (produced by others), PPE, ventilators and other medical equipment; Bradley negligently misled investors by making such statements.

28. On March 23, 2020, Parallax issued a press release, drafted by Arena and Bradley, with the headline, "Parallax Announces **Immediate Availability** of Point-of-Care COVID Diagnostic Testing Kits, Personal Protection Equipment (PPE) and Medical Supplies." (Emphasis added.) The release stated that Parallax had "signed a contract with a medical distribution company in China owned by a prominent businessman" and, beginning that day, "the Company [was] accepting orders for and **[had] immediate availability** of the Coronavirus, ("COVID-19") Point-of-Care Diagnostics Kits for American medical practices, hospitals, nursing operations, emergency centers and nursing homes." (Emphasis added.) The release further stated "the Company [would] also be **providing immediate availability and access** to Personal Protection Equipment, ("PPE") including, but not limited to, **FDA approved** medical masks, protective sterile gowns, eye protecting goggles, face shields, ventilators, and other medical grade equipment." (Emphasis added.)

29. The March 23, 2020 release contained quotes from both Arena and Bradley about Parallax. Arena stated that Parallax was "fortunate to have the U.S. … Government lift sanctions and tariffs on medical products from China that opened up this opportunity … and for Parallax to **immediately provide a solution to fill the void of overwhelming demand related to Personal Protective Equipment**." (Emphasis added.) Bradley emphasized that Parallax's remote patient

monitoring system would permit Parallax "to capture in real-time the test results achieved from **the test kits we are offering through this partnership today**." (Emphasis added.)

30. Additionally, the March 23, 2020 release stated that Parallax had "created a Government and Medical Practice website to **process orders immediately**," and that the company had "access to large inventories of all the available products and [was] offering the products in all fifty U.S. states and all U.S. territories from the Company's website located at www.goodhealthoutcomes.com." (Emphasis added.) A "supply booklet," which Bradley created and posted on the Parallax website, identified the PPE and medical equipment that purportedly could be purchased from Parallax by completing an online order form. Bradley listed each piece of equipment for sale, the minimum and maximum quantity purportedly for sale, and the price. The "supply booklet" included COVID-19 test kits, ventilators, PPE, thermometers, surface cleaning agents and hand sanitizer. All of the equipment was represented to be FDA-approved, and the website listed the delivery time for most items as "within 7 days."

31. In fact, Parallax never possessed the equipment that it offered for sale on its website. Rather, Arena and Bradley planned to acquire the equipment under a "Master Distribution/Reseller Agreement" (the "Distribution Agreement") that Parallax executed with a supplier (the "Supplier") on March 22, 2020. All of the information concerning the equipment that Bradley posted to Parallax's website was provided by the Supplier.

32. Even with the Distribution Agreement in place, Parallax was not in a position to deliver the PPE and medical equipment that it offered for sale. Critical hurdles prevented the company from buying and reselling any equipment sourced by the Supplier. On March 22, 2020, when it entered into the Distribution Agreement, Parallax was insolvent and it did not have the necessary financial wherewithal to fulfill its obligations under the agreement. Parallax also

lacked the FDA registrations required to import and distribute the equipment. Parallax and Arena knew of, or recklessly disregarded, these hurdles. Bradley failed to take reasonable steps to ascertain whether Parallax had surmounted them.

33. Before disseminating the March 23, 2020 press release, neither Arena nor Bradley consulted anyone about the legality of importing or distributing PPE or medical equipment supplied by foreign parties. Rather, the person who replaced Arena as President of Parallax in early March 2020 (the "Parallax President"), upon reading the March 23, 2020 press release after it was issued, emailed Arena and Bradley the same day informing them that Parallax could not sell the equipment it was offering on its website until the company registered with the FDA. The Parallax President further informed Arena and Bradley that each device and its manufacturer also had to be registered with the FDA.

34. After receiving the Parallax President's email, Arena and Bradley approached an FDA-registered company (the "Distribution Company") authorized to import and export medical equipment in the U.S. to partner with Parallax to distribute the equipment purportedly being sourced by the Supplier. Parallax and the Distribution Company exchanged drafts of a joint venture agreement, but did not execute it because they failed to settle on all of the terms. Neither company was able to obtain documentation confirming the FDA registrations for the equipment Parallax offered for sale or the manufacturers of the equipment.

35. Nonetheless, on March 30, 2020, Parallax issued a press release, drafted by Arena and Bradley, falsely stating that "world leading inventories and end-to-end logistics services related to the International Coronavirus, ("COVID-19") response are now becoming available at [Parallax's] website www.goodhealthoutcomes.com." The press release further touted that Parallax was "offering … procurement managers from both private and government entities the

ability to purchase … much needed personal protection equipment, ("PPE") items from FDA-registered manufacturers" through its "online portal," including "medical masks, invasive and passive ventilators, thermometers, medical protective gowns, face protection, other personal protective equipment and COVID-19 point of care test kits."

36. On April 9, 2020, Parallax issued another press release continuing to mislead investors that it was capitalizing on the COVID-19 pandemic. Drafted by Arena, the press release stated that Parallax had "Receive[d] **Over $10 million of Telehealth and Medical Supply Contracts**." (Emphasis added.) Arena quoted himself in the press release, remarking, "We are pleased to report that **we have presently received over $10 million of orders for Telehealth related and Medical Supply contracts we are in the process of fulfilling** and we anticipate that number to grow significantly in the coming weeks and months." (Emphasis added.)

37. The purported "medical supply contracts" referenced in the April 9, 2020 press release referred to orders that Parallax had received for the COVID-19-related products offered for sale on its website. However, contrary to the company's representations, Parallax only had approximately $245,000 in orders at the time. Parallax and Arena knew, or recklessly disregarded, that the other orders that the company claimed were merely requests for price quotations that had not been pursued by the requesting parties or orders that had been cancelled.

**Defendants' Misleading Statements Caused a Surge in Market Activity**

38. Between January 1, 2020 and March 10, 2020, the average price of Parallax's common stock at the close of the U.S. securities markets each day was $0.045 per share and daily trading volume averaged 282,228 shares (collectively, the "Q1 Averages"). However, between March 11, 2020, the day that Parallax first announced its efforts to combat COVID-19

by developing a screening test, and April 9, 2020, the last day of trading before the Commission suspended trading in the company's securities, Parallax's closing stock price each day averaged $0.054 per share, and daily trading volume averaged 1,095,515 shares, which was respectively 20% and 288% higher than the Q1 Averages.

39. On the days that Parallax made the false statements described in this Complaint, the surge in market activity was even greater. During the four trading days between March 12, 2020 and March 17, 2020, when Parallax claimed a COVID-19 test that it was producing would be available soon, the company's stock price at the close of U.S. securities markets averaged $0.064 per share and the daily trading volume averaged 2,141,300 shares, 42% and 659% higher than the Q1 Averages.

40. Moreover, when Parallax misleadingly claimed on March 23, 2020 and March 30, 2020 to have COVID-19 related equipment for sale, the volume of trading in its common stock rose substantially. On March 23, 2020, 2,049,200 Parallax shares traded, reflecting a 182% increase over the 726,100 shares exchanged the prior trading day. The company's stock price also increased, climbing 7% from $0.056 to $0.060 per share at the close of the U.S. securities markets. Likewise, on March 30, 2020, trading volume rose 33%, as 1,036,500 Parallax shares traded compared to 777,000 shares the day before, although Parallax's stock price closed at $0.050 per share on both days.

41. Parallax and Arena made the misleading statements concerning the availability of the company's purported COVID-19 test, its possession of PPE and medical equipment and the volume of telehealth and medical supply orders with the intent to artificially increase, or at least stabilize, Parallax's stock price. Prior to the issuance of the misleading statements, Parallax's stock price declined from a high of $0.070 per share to a low of $0.025 per share between

January 1, 2020 and March 10, 2020. As CEO of Parallax, Arena was under pressure to stop the decline in the company's stock price.

42. Arena and Bradley were impacted by Parallax's declining stock price, because each had accepted stock and options in lieu of salary.

**FIRST CLAIM**
**Fraud in the Purchase or Sale of Securities in Violation of**
**Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Against Parallax and Arena)**

43. The Commission repeats and incorporates by reference the allegations in paragraphs 1-42 above as if set forth fully herein.

44. Defendants Parallax and Arena engaged in a fraudulent course of conduct that included making material misrepresentations and omissions regarding the immediate availability of a COVID-19 screening test and/or COVID-19 related equipment, including PPE.

45. By engaging in the conduct described above, Defendants Parallax and Arena, directly or indirectly, acting knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, employed devices, schemes or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of business which operated as a fraud or deceit upon certain persons.

46. By reason of the forgoing, each of the Defendants Parallax and Arena violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM
### Fraud in the Offer or Sale of Securities in
### Violation of Sections 17(a)(1) and (3) of the Securities Act
### (Against Parallax and Arena)

47. The Commission repeats and incorporates by reference the allegations in paragraphs 1-42 above as if set forth fully herein.

48. Defendants Parallax and Arena engaged in a fraudulent course of conduct that included making material misrepresentations and omissions regarding the immediate availability of a COVID-19 screening test and/or COVID-19 related equipment, including PPE.

49. By engaging in the conduct described above, Defendants Parallax and Arena, directly and indirectly, acting knowingly, recklessly, or negligently, in the offer or sale of securities by the use of means or instrumentalities of interstate commerce or the mails, employed devices, schemes or artifices to defraud and engaged in transactions, practices or courses of business which operated as a fraud or deceit upon purchasers of the securities.

50. By reason of the forgoing, Defendants Parallax and Arena violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## THIRD CLAIM
### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a)(3) of the Securities Act
### (Against Defendant Bradley)

51. The Commission repeats and incorporates by reference the allegations in paragraphs 1-42 above as if set forth fully herein.

52. Defendant Bradley engaged in a course of conduct that included making material misrepresentations and omissions regarding the immediate availability of COVID-19 related equipment, including PPE.

53. By engaging in the conduct described above, Defendant Bradley, directly and indirectly, acting negligently, in the offer or sale of securities by the use of means or instrumentalities of interstate commerce or the mails, employed devices, schemes or artifices to defraud and engaged in transactions, practices or courses of business which operated as a fraud or deceit upon purchasers of the securities.

54. By reason of the forgoing, Defendant Bradley violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A. permanently enjoining and restraining Defendants, and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect;

B. requiring Defendants to pay the appropriate civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

C. barring Defendants Arena and Bradley from participating in any offering of a penny stock, including: acting as a promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of a penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77(t)g] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(6)];

D. barring Defendant Arena, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], or Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

E. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F. Award such other and further relief as the Court deems just and proper.

Dated: July 7, 2021

By: *(signature: Alexander Vasilescu)*

Alexander M. Vasilescu
Alfred A. Day*
Rua M. Kelly*
Susan Curtin*
Andrew Palid*
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(617) 573-8941
kellyru@sec.gov

*Seeking admission *pro hac vice* in the S.D.N.Y.